**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**(MIAMI DIVISION)**

In re:                                           Case No. 13-33407-LMI
                                                 Chapter 7

FELIX MOSTELAC,

                    Debtor.

_____/

JPL CAPITAL INVESTMENT, LLC,                     Adv. Proc. No.

                    Plaintiff,

                    v.

FELIX MOSTELAC,

                    Defendant.
_____/

## COMPLAINT TO DENY DISCHARGE

Plaintiff, JPL Capital Investment, LLC ("JPL"), by and through undersigned counsel,

objects to the discharge of Debtor, Felix Mostelac ("MOSTELAC") and states:

### NATURE OF ACTION

1. This is an action pursuant to 11 U.S.C. §727 seeking to deny the Debtor a discharge due

to the Debtor concealing, destroying, falsifying or failing to keep or preserve records of the

Debtor's financial condition, making a false oath, for withholding information, and for failing to

satisfactorily explain the "loss" of his assets.

2. This adversary proceeding arises out of and relates to the case under Chapter 7 of the

Bankruptcy Code of In re: Felix Mostelac, Case No. 13-33407-LMI on the docket of this Court.

1

## PARTIES

3. Plaintiff is a creditor of Debtor.

4. The Debtor is a resident of the State of Florida and is currently a debtor in the Chapter 7 case of In re: Felix Mostelac, Case No. 13-33407-LMI on the docket of this Court.

## JURISDICTION AND VENUE

5. This Court has jurisdiction under 11 U.S.C. § 727 and 28 U.S.C. §§ 1334 and 157.

6. This adversary proceeding is a core proceeding, under 28 U.S.C. § 157(b)(2)(J), arising under Title 11 U.S.C.

7. Venue is property in this Court pursuant to 28 U.S.C. § 1409(a).

## BACKGROUND AND GENERAL ALLEGATIONS

8. On September 30, 2013, MOSTELAC filed his voluntary petition for relief under Chapter 7 of the Bankruptcy Code.

9. In the fall of 2009, JPL invested $1,100,000.00 with MOSTELAC after he convinced JPL's managing members that he ran a successful oil trading company called QUBEOIL.

10. MOSTELAC promised to use the $1,100,000.00 to finance the purchase of a letter of credit for purchase and re-sale of fuel through his company QUBEOIL. The investments were made by JPL in three separate installments, two in September totaling $800,000.00, and one in October for $300,000.00. The checks and money orders were hand delivered to MOSTELAC, who in turn deposited the funds at U.S. Century Bank and Banco Popular in a commercial account he had under the name of his company QUBEOIL. MOSTELAC does not dispute receiving $1,100,000.00 from JPL to do an oil operation (*See* Exhibit 1- Felix Mostelac Depo. p. 57: 21-24 and p. 59: 12-25).

11. MOSTELAC and QUBEOIL promised monthly returns to JPL.

2

12. When MOSTELAC and QUBEOIL failed to make any payments, JPL requested proof that the monies were in fact invested by MOSTELAC and QUBEOIL to purchase letters of credit to finance the oil operations. Such proof was never delivered. MOSTELAC repeatedly made promises that the oil deals could not consummate for a variety of reasons. The last excuse was premised on an explosion at an oil rig facility in Puerto Rico. To date, of the $1,100,000.00, only $70,000.00 was returned by MOSTELAC and QUBEOIL.

13. A lawsuit was filed in August of 2010 by JPL, in attempt to recover the monies and obtain discovery on how the funds were invested; MOSTELAC and QUBEOIL would not voluntarily produce such information.

14. One of the key documents MOSTELAC and QUBEOIL had provided to induce JPL into entering into the joint venture was an audit letter and financial statements for QUBEOIL prepared by Luis G. Brito, the accountant for QUBEOIL and MOSTELAC. (*See* Composite Exhibit 2 – Affidavit of JPL and attached financial statements for QUBEOIL from Brito & Brito.)

15. Luis G. Brito ("Mr. Brito") was deposed in the lawsuit. Mr. Brito admitted to being the accountant for MOSTELAC and QUBEOIL. He denied, however, preparing the audit letter and purported audited financial statements for QUBEOIL. Thus, it is obvious that MOSTELAC doctored the financial statements and audit letter, and identified Mr. Brito as the person who prepared the financial statements.

16. The statements and audit letter were shown by MOSTELAC to JPL, in order to induce JPL into handing over its money to MOSTELAC. The purported audited financial statements represented a multi-million dollar net worth for QUBEOIL in 2009, and over $4,500,000.00 in revenues. These figures, however, we have now learned were grossly false. MOSTELAC's

3

accountant, Luis Brito, was deposed and produced tax returns and financial statements for QUBEOIL in 2009, showing only a small fraction of that amount in revenues and losses of over $480,000.00 during the subject year. Moreover, although the financial statements indicate that they were prepared and audited by Mr. Brito, the accountant denied ever doing so.

17. In addition to obtaining discovery demonstrating that the financial statements were false, subpoenas were served at various banks, including U.S. Century Bank and Banco Popular for the banking records of QUBEOIL. The banking records produced by the banks in response to the subpoenas indicate unequivocally that the QUBEOIL accounts at both U.S. Century and Banco Popular were opened almost contemporaneous to the funds received by MOSTELAC from JPL.

18. The bank accounts had almost no money until the JPL investments. Immediately after receiving the JPL monies, MOSTELAC made a series of suspicious transfers that raised Anti-Money Laundering concerns by bank examiners, which resulted in the U.S. Century Bank closing the QUBEOIL account, despite the account having a positive balance. Unfortunately, by the time the account had been closed over two hundred thousand dollars from QUBEOIL's U.S. Century Bank records were transferred to Ms. Diaz Banos, MOSTELAC'S girlfriend, over $180,000.00 were transferred to a clothing store in Spain called Petrofeno, S.L., over $50,000.00 were transferred to another person in Spain by the name of Rita Trujillo Garcia, who apparently is MOSTELAC'S mother, and for personal use by MOSTELAC.

19. MOSTELAC'S deposition was taken in September of 2011, following the entry of multiple court orders compelling his attendance at the deposition. He was confronted with the documentary evidence but refused to answer numerous questions. MOSTELAC, did, however, identify Norvis Diaz Banos as his girlfriend and the person with whom he fathered a child.

20. MOSTELAC admitted to receiving $1,100,000.00 from JPL (the "JPL Funds") in the

4

deposition and recognizing that it was supposed to be invested in the oil transactions. Although he did not answer many questions, he did not deny making multiple transfers to his girlfriend, Norvis Diaz Banos. These transfers are demonstrated by the banking records.

21. Further, MOSTELAC did not negate that he never purchased a letter of credit with the $1,100,000.00 JPL handed over to him. MOSTELAC simply stated that JPL gambled like going to the casino. The reality, however, is that MOSTELAC absconded with JPL's monies and transferred it for personal use and to his girlfriend, Norvis Diaz Banos.

22. Ms. Diaz Banos was also deposed recently in the aforementioned litigation. She admitted receiving transfers from the QUBEOIL account, although she testified that she was an employee of the company. When asked what skill and expertise she brought to the transaction, she admitted none, since she is an interior designer by trade. Ms. Banos testified that her father was the former Minister of Agriculture of Cuba and that her family had contacts with Russians. Supposedly, Ms. Banos offered her contacts to MOSTELAC in exchange for payment. Ms. Banos admitted that she and MOSTELAC were residing together on Allison Road in Miami-Dade County, Florida—the same corporate address utilized by QUBEOIL. It is from that location that the couple conducted their operations.

### SPECIFIC ALLEGATIONS AS TRANSFERS

23. The bank records from U.S. Century Bank and BANCO POPULAR for the QUBEOIL account were subpoenaed. These bank records are unequivocal in demonstrating the fraud that was orchestrated by MOSTELAC and QUBEOIL on JPL by showing that the funds were never invested in the oil industry, and were transferred to MOSTELAC's girlfriend Norvis Diaz Banos, MOSTELAC'S mother in law, Nereyda Banos, and for personal use by MOSTELAC, unrelated to the contemplated oil transactions. Further, MOSTELAC doctored bank letters on U.S.

5

Century Bank letter head and showed them to JPL to legitimize his operations.

24. With respect to the U.S. Century Bank records a review of these records, demonstrate the following key points:

> a. On September 22, 2009 $400,000.00 were deposited in QUBEOIL's U.S. Century Bank Account by MOSTELAC. *(See* Check No. 0992 dated September 22nd for $300,000.00 and Cashier's Check No. 7227460 for $100,000.00) *(See* Exhibit 3 - U.S. Century Bank records 00001-00005).
>
> b. QUBEOIL had no other funds at the time at U.S. Century Bank, and the sole signatory on the Qubeoil account was MOSTELAC. (MOSTELAC asked U.S. Century Bank to add Mr. Sergio Pino, whom was a Director of U.S. Century Bank, and whom MOSTELAC solicited to join him on the joint venture, to also be a signatory, but the signature cards were not signed by Mr. Pino, and according to Mr. Pino, who deposed in this case, he never entered into a joint venture with MOSTELAC. *(See* Exhibit 3 - U.S. Century Bank 00083). Mr. Pino testified that he did not remember whether or not he became a signatory to the Qubeoil account, but he believes he never did because the document did not have his signature. *(See* Exhibit 4 - Sergio Pino Depo. page. 64: 2-15).
>
> c. Soon thereafter, $100,000.00 is transferred to Nereyda Julia Banos Lezc (Mr. MOSTELAC's mother in law who is a retired veterinarian from Cuba with no training or experience in the oil industry) and $80,000.00 was transferred to Petrofeno S.L. at the direction of MOSTELAC. According to Ms. Banos, she owned a 10% interest in Petrofeno SL. Further, based on research and some internal documents produced by US Century Bank, Petrofeno SL is a

6

furniture/clothing store located in Madrid. Ms. Diaz Banos testified in her recent deposition that she worked with a furniture manufacturer in Madrid in connection with her interior design projects. Furthermore, she testified that MOSTELAC and her resided in Madrid before moving to Miami, Florida in 2006-07.

d. According to the U.S. Century Bank records produced in response to the subpoena, Ms. Banos Lezcano's transfer was to a Swiss Bank account and Ms. Banos Lezc made subsequent transfers on August 30th, September 1 and September 9, 2010. *(See* Exhibit 3 - U.S. Century Bank 00092). Further, according to the internal bank records Petrofeno, S.L., has nothing to do with the oil industry *(See* Exhibit 3 - U.S. Century Bank 00096 and 00097, 00103 (concerns raised by Maria DeWitt, CAMS, an AML officer at U.S. Century Bank). Ms. Banos Lezc attended university in Geneva, Switzerland, and was previously married with a Swiss citizen. She testified in her recent post judgment deposition that she maintained Swiss Bank accounts.

e. Another $100,000.00 was transferred to Petrofeno, S.L. in December, three days after a $300,000.00 check from JPL was deposited into the Qubeoil account *(See* Exhibit 3 - U.S. Century Bank 00015- Cashier's check No. 7420147);

f. Over $207,250.00 was paid over to Norvis Diaz Banos and Nereyda Julia Banos Lezc, whom we now know is MOSTELAC's girlfriend. *(See* Exhibit 1 - Felix Mostelac Depo. p. 21:20-24).

g. Not one single letter of credit for the supply of oil was purchased. Almost all the funds in the U.S. Century Bank account for QUBEOIL came from the $700,000.00 given to MOSTELAC by JPL in three separate checks.

7

h. On September 29, 2010, U.S. Century Bank made a unilateral decision to close the QUBEOIL account. (*See* Exhibit 3 - U.S. Century Bank 00094). The bank records and email communications exchanged with MOSTELAC demonstrate distrust over MOSTELAC's transfers, and that he was not being candid with the bank.

25. U.S. Century Bank produced a letter with Bate Stamp 00109 (*See* Exhibit 3), which, according to a Senior U.S. Century Bank Vice President, MOSTELAC forged the bank's name and his signature onto this letter.

26. With respect to the forged letter, a Senior U.S. Century Bank Vice President, Miguel Coira, testified that he suspects that QUBEOIL [MOSTELAC] doctored his signature on a letter at U.S. Century Bank letterhead. (*See* Exhibit 5 - Miguel Coira Depo. Page 117: 3-23, and Page 126:12-22, referring to Exhibit 13).

27. That was not the only letter, MOSTELAC doctored for QUBEOIL on U.S. Century Bank letterhead. In fact, if one believes the Senior Vice President from U.S. Century Bank, MOSTELAC apparently doctored a second letter specifically directed to JPL stating that he [MOSTELAC] and QUBEOIL were under contract financing a multi-million dollar oil deal. This letter, attached as Exhibit 14 to Miguel Coira's deposition was given by MOSTELAC and QUBEOIL to JPL in order to assure the JPL investors and managing members that payment would be forthcoming, and that they would be soon receiving a return of the capital and interest. (*See* Affidavit of JPL, attached as Composite Exhibit 2). Unfortunately, this apparently was just another doctored document from MOSTELAC.

28. Banco Popular's Qubeoil bank records demonstrate that the account was opened in July of 2009, and had at all times little over $1,500.00, until JPL's $400,000.00 check was deposited

8

in September of 2009. Specifically, Cashier's Check No. 7286042 for $400,000.00 was deposited into Banco Popular's Qubeoil account on September 21, 2009. (*See* Exhibit6 - Banco Popular Bate Stamp 000287). The beginning balance for the Qubeoil account prior to this deposit was $16.31. In fact, there were several NSF charges to the account for overdrafts. A review of the Banco Popular records demonstrate numerous transactions and transfers to MOSTELAC's girlfriend, Norvis Nedeff Diaz, a/k/a Norvis Diaz Banos. Not one transaction was related to the purchase of a letter of credit or the purchase and delivery of fuel.

29. The transfers were made to MOSTELAC's girlfriend, who has no knowledge of the oil industry, MOSTELAC's mother in law who was a veterinarian with no experience in the oil industry, and to Petrofeno SL, a clothing/furniture store are as follows:

a. $11,000.00 wire transfer on September 28, 2009, from Banco Popular Account of Quality Business Enterprises Oil (Qubeoil), LLC;

b. $4,900.00 check #104 from Banco Popular Account of Quality Business Enterprises Oil (Qubeoil), LLC, dated on or about September 22, 2009;

c. $3,500.00 check #108 from Banco Popular Account of Quality Business Enterprises Oil (Qubeoil), LLC, dated on or about September 23, 2009;

d. $3,250.00 check #132 from Banco Popular Account dated on or about October 8, 2009;

e. $3,250.00 check #146 from Banco Popular Account dated on or about October 19, 2009;

f. $3,250.00 check #5300 from U.S. Century Bank Account dated on or about October 30, 2009;

g. $3,250.00 check #91 from U.S. Century Bank Account dated on or about

9

November 17, 2009;

h. $4,500.00 check #93 from U.S. Century Bank Account dated on or about December 1, 2009;

i. $4,500.00 check #95 from U.S. Century Bank Account dated on or about December 21, 2009;

j. $100,000.00 wire transfer from the U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about October 20, 2009;

k. $80,000.00 wire transfer to Petrofeno SL from U.S. Century Bank Account of Quality Business Enterprise Oil (Qubeoil), LLC, on or about October 29, 2009;

l. $100,000.00 wire transfer from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about December 14, 2009;

m. $4,500.00 check #1002 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil) LLC, on or about January 9, 2010;

n. $4,500.00 check #1015 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil) LLC, on or about February 2, 2010;

o. $5,000.00 check #1017 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about February 8, 2010;

p. $4,500.00 check #1023 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about February 16, 2010;

q. $4,500.00 check #1040 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about March 9, 2010;

r. $5,800.00 check #1046 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about March 18, 2010;

s. $50,000.00 check #1054 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about March 28, 2010;

t. $5,850.00 check #1055 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about March 30, 2010;

u. $5,800.00 check #1057 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about April 9, 2010; and

v. $5,800.00 check #1068 from U.S. Century Bank Account of Quality Business Enterprises Oil (Qubeoil), LLC, on or about May 3, 2010.

## COUNT I
## 11 U.S.C. § 727(a)(3)

30. Plaintiff re-alleges paragraphs 1 through 29.

31. MOSTELAC has concealed, destroyed, mutilated falsified, or otherwise failed to keep or preserve any meaningful recorded information concerning the JPL Funds or his own assets despite the substantial amount of assets over which MOSTELAC had and still has control.

32. His failure to keep any records, and/or his efforts to actively conceal information, about his financial condition is entirely without justification.

33. MOSTELAC knowingly and fraudulently, in or in connection with this case, was unable to justify his lack of records during the Meeting of Creditors.

**WHEREFORE**, , Plaintiff JPL CAPITAL INVESTMENT, LLC respectfully requests this Court enter an Order denying the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(3) and granting Plaintiff such other and further relief as it appears just and proper.

11

## COUNT II
## 11 U.S.C. § 727(a)(4)(A)

34. Plaintiff re-alleges paragraphs 1 through 29.

35. MOSTELAC knowingly and fraudulently, in or in connection with this case, made false oaths or accounts in the Schedules regarding undisclosed transfers of funds that were made to, *inter alia*, Ms. Diaz Banos, MOSTELAC'S girlfriend, a clothing store in Spain called Petrofeno, S.L., and Rita Trujillo Garcia, who apparently is MOSTELAC'S mother, and also for MOSTELAC's own personal use.

36. MOSTELAC knowingly and fraudulently transferred the foregoing funds, including the JPL Funds, for his own personal use without the authorization of JPL.

37. MOSTELAC knowingly and fraudulently, in or in connection with this case, made a false oath or account regarding the JPL funds during the Meeting of Creditors.

**WHEREFORE**, Plaintiff JPL CAPITAL INVESTMENT, LLC respectfully requests this Court enter an Order denying the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(4)(A) and granting Plaintiff such other and further relief as it appears just and proper.

## COUNT III
## 11 U.S.C. § 727(a)(4)(D)

38. Plaintiff re-alleges paragraphs 1 through 29.

39. MOSTELAC knowingly and fraudulently, in or in connection with this case, withheld information from the estate concerning undisclosed monies and transfers of funds that were made to, *inter alia*, Ms. Diaz Banos, MOSTELAC'S girlfriend, a clothing store in Spain called Petrofeno, S.L., and Rita Trujillo Garcia, who apparently is MOSTELAC'S mother, and also for MOSTELAC's own personal use.

40. MOSTELAC knowingly and fraudulently transferred the foregoing funds, including the

12

JPL Funds, for his own personal use without the authorization of JPL.

41. MOSTELAC knowingly and fraudulently, in or in connection with this case, made a false oath or account regarding the JPL funds during the Meeting of Creditors.

**WHEREFORE**, Plaintiff JPL CAPITAL INVESTMENT, LLC respectfully requests this Court enter an Order denying the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(4)(D) and granting Plaintiff such other and further relief as it appears just and proper.

## COUNT IV
## 11 U.S.C. § 727(a)(5)

42. Plaintiff re-alleges paragraphs 1 through 29.

43. MOSTELAC has failed to satisfactorily explain his sudden "loss" of the substantial amount of assets over which MOSTELAC had and still has control—including the whereabouts of the JPL Funds.

44. His lack of knowledge and lack of explanation are inexcusable.

45. MOSTELAC was entirely unable to reasonably justify his lack of assets and inability to meet his debts during the Meeting of Creditors.

**WHEREFORE**, Plaintiff JPL CAPITAL INVESTMENT, LLC respectfully requests this Court enter an Order denying the Debtors' discharge pursuant to 11 U.S.C. § 727(a)(5) and granting Plaintiff such other and further relief as it appears just and proper.

Dated this 6th day of January, 2014

13

Respectfully submitted,

By: _____

Richard Bec (FBN 662585)
Email: RBec@cfclaw.com
CONCEPCION MARTINEZ & BELLIDO
255 Aragon Avenue, 2nd Floor
Coral Gables, FL 33134
PH: (305) 444-6669
Fax: (305) 444-3665
*Attorneys for JPL Capital Investment, LLC*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 6th day of January, 2014, I electronically served the

foregoing on all counsel of record.

_____
RICHARD BEC

14



1.

1    IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN
           AND FOR MIAMI-DADE COUNTY, FLORIDA

2
              CASE NO. 10-37899 CA 40

3

4    JPL CAPITAL INVESTMENT, LLC,
     A FLORIDA LIMITED LIABILITY COMPANY,

5
              Plaintiff,

6

7    -vs-

8    QUALITY BUSINESS ENTERPRISES OIL
     (QUBBOIL), LLC, A FLORIDA LIMITED

9    LIABILITY COMPANY, FELIX MOSTELAC,
     AN INDIVIDUAL RESIDING IN FLORIDA,

10

11            Defendants.
     _____/

12

13       VIDEOTAPED DEPOSITION OF FELIX MOSTELAC

14              VOLUME I

15            September 6, 2011
              10:48 a.m. - 5:42 p.m.

16

17          CONCEPCION, MARTINEZ & BELLIDO
                255 Aragon Avenue
18              Coral Gables, Florida

19

20       Taken before W. THOMAS HUGHES, RPR, RMR,

21   RDR, CRR, FPR, and Notary Public in and for the State

22   of Florida at large, pursuant to Notice of Taking

23   Deposition.

24

25

**18**

1    MR. ALTIERI: Actually can I have a minute?
2    MR. PUENTE: Sure.
3    MR. ALTIERI: Thanks.
4    THE VIDEOGRAPHER: Stand by to go off media
5    unit one. Going off at 11:10 a.m.
6    (Off the record.)
7    THE VIDEOGRAPHER: We're now back on media
8    unit one. The time back on is 11:15 a.m.
9    BY MR. PUENTE:
10    Q.   Mr. Mostelac, I just want to make a couple of
11    things clear for you.
12    Because of the nature of this case and
13    because of the nature of the documents we've seen in
14    this case, okay, I'm going to ask you questions about
15    you and about your family that may seem personal.
16    That is not my intent, but that's the rules. I'm
17    following the rules, okay? I have to ask you the
18    questions.
19    If there's a problem with a question, you
20    have three attorneys, and they will object to the form
21    of my question, okay, and if -- they can advise you
22    not to answer a question.
23    Normally, though, the only questions that
24    you're not supposed to answer is privileged
25    information, meaning a communication between you and

**19**

1    your attorney, okay?
2    So I'm going to ask you the question. If you
3    have a problem with it, I still ask you to answer the
4    question and let your attorneys do their job, okay?
5    Fair?
6    A.   Okay.
7    Q.   All right. Because you indicated some
8    concern about answering questions regarding your
9    children, I'm going to ask you those questions, and
10    you tell me as best you can an answer to the question,
11    and if you can't tell me why or answer my question, I
12    ask you to tell me why, and then we'll go off the
13    record, and I'll ask you to give me the information
14    off the record, okay?
15    MR. WEBB: We are going to go through all of
16    this information off the record, correct?
17    MR. PUENTE: Well, let me set the predicate
18    first.
19    BY MR. PUENTE:
20    Q.   Do you have children?
21    A.   Yes.
22    Q.   How many children do you have?
23    A.   One.
24    Q.   Are they adults -- is he an adult?
25    A.   No.

**20**

1    Q.   Okay. Does he live here in Miami?
2    MR. WEBB: This is what we were going to go
3    off the record with, correct?
4    BY MR. PUENTE:
5    Q.   Does he live here in Miami?
6    A.   Yes.
7    Q.   Okay.
8    MR. PUENTE: Off the record now.
9    MR. WEBB: And the videotape as well.
10    MR. PUENTE: Go off the video for a second.
11    THE VIDEOGRAPHER: Going off media unit one.
12    Going off at 11:18 a.m. We're off the record.
13    BY MR. PUENTE:
14    Q.   Okay. And we'll keep this confidential
15    outside of the record, okay?
16    What is the name of your son?
17    A.   Danella.
18    Q.   It is a she?
19    A.   Yes.
20    Q.   Okay. And how old is she?
21    A.   Seven.
22    Q.   And you have no other children?
23    A.   Not that I know of.
24    MR. PUENTE: Okay. Back on the record.
25    THE VIDEOGRAPHER: Stand by. We are back on

**21**

1    media one. The time is 11:19 a.m.
2    BY MR. PUENTE:
3    Q.   Excuse me a second.
4    Mr. Mostelac, who is the mother of your
5    child?
6    A.   We come back to the same thing. Why are we
7    here? According to what I understand, you want to go
8    fast.
9    Q.   These are standard questions, Mr. Mostelac.
10    A.   I need to answer these, too?
11    Q.   You can't -- you can't ask for instructions.
12    A.   What is the business here? I have nothing to
13    do with, nor do I want to -- to -- for my family to be
14    in this. I don't want to have any more problems with
15    my family.
16    Q.   Okay. Mr. Mostelac, I understand your
17    concern. The reason I'm asking you these questions is
18    because they're standard discovery questions that I'm
19    entitled to ask a party Defendant in a lawsuit.
20    So I ask you, what is the name of the mother
21    of your child?
22    A.   Norvis Diaz.
23    Q.   Is she also known as Norvis Diaz Banos?
24    A.   I believe so. I don't know.
25    Q.   Where does Norvis Diaz live?

15  (Pages 54 to 57)

**54**

1  referring to, I'm going to mark here Plaintiff's
2  Exhibit Number 85, and I am going to ask you for you
3  to identify this document.
4      (The document was marked as Plaintiff's
5  Exhibit 85 for identification.)
6      MS. RODZ: Mr. Puente, is it one of the
7  documents --
8      MR. PUENTE: Yes, I provided those documents.
9      MS. RODZ: Can you tell me which one right
10  now?
11      MR. WEBB: What is it?
12      MR. PUENTE: Sure. It's Exhibit C. It was
13  marked Exhibit C. It's an attachment to the third
14  amended complaint, to the prior amended complaint
15  in this case, and original complaint.
16      You have a copy, Chad.
17      MS. RODZ: These are in order, no?
18      MR. PUENTE: It should be behind Brito &
19  Brito Accounting. You should have the documents,
20  and you can also look at the complaint if you have
21  a copy of it.
22      MS. RODZ: I just wanted to go ahead and have
23  the documents to refer to them.
24      Okay. Thank you.
25      MR. PUENTE: Thank you.

**55**

1  BY MR. PUENTE:
2   Q.  Can you identify this document?
3   A.  In what sense?
4   Q.  Can you identify what that document is?
5   A.  It's a piece of paper.
6   Q.  Is that an agreement that you entered into
7  with JPL Capital Investment?
8   A.  Again, I'll repeat the same thing. Until
9  this is not -- this matter is not cleared before the
10  judge, I won't speak anything about this matter.
11   Q.  Okay.
12   A.  After it clears up, then we will explain
13  everything.
14   Q.  What do you want clarified, sir? What do you
15  want clarified?
16   A.  I will repeat it again. In one of my
17  signatures, a fraud is noticeable.
18   Q.  Can you show me where the fraud is
19  noticeable?
20   A.  We should do that before the judge.
21   Q.  Well, I'm asking you here in this deposition.
22   A.  And I'm answering.
23   Q.  Can you show me --
24   A.  Maybe my answer is not likable to you, but
25  that's my answer.

**56**

1   Q.  So that you can help me understand for JPL
2  Capital Investment, and so I can understand what
3  you're referring to, can you show me in that document
4  where you claim your signature is forged?
5   A.  We will do that before the judge.
6   Q.  I'm asking you now during this deposition.
7      MR. WEBB: Felix, if I may interject, you are
8  going to have to answer the questions that are
9  posed to you.
10      THE WITNESS: Well, I don't want to answer
11  that question here. I'm not here to help him.
12      MR. WEBB: Can we have five minutes?
13      THE WITNESS: He's not here to help me. Why
14  should I help him?
15      THE VIDEOGRAPHER: Stand by to go off media
16  unit two. Going off at 2:14.
17      (Off the record.)
18      THE VIDEOGRAPHER: We are now back on media
19  unit two. The time back on is 2:23 p.m.
20  BY MR. PUENTE:
21   Q.  Okay. I just want to make a -- I'm going to
22  make a statement on the record. It is now 2:20 p.m.
23  We took a break from the deposition at 12:30. I've
24  only -- since coming back from lunch at 1:30,
25  Mr. Mostelac and his lawyers were present at 2:00

**57**

1  o'clock. I've only been able to get five minutes
2  worth of testimony, most of which are questions that
3  have not been answered.
4      I'm going to try again because I don't want
5  to interrupt the court, but I'm going to ask you,
6  Mr. Mostelac, to please answer my questions.
7      You're under a court order here for your
8  deposition. And, again, I'm going to ask you
9  questions and give you an opportunity to respond,
10  okay? Did you get all of that?
11      Okay. Mr. Mostelac, when did you first meet
12  Jesus Lopez?
13   A.  I don't remember.
14   Q.  Okay. Did you meet him in connection with an
15  oil deal?
16   A.  We met, but we didn't fall directly into that
17  point.
18   Q.  Did JPL Capital Investment provide you with
19  $1.1 million?
20   A.  Make the question more specific.
21   Q.  Did JPL Capital Investment provide you, and
22  by "you," I mean you, Felix Mostelac, and Quality
23  Business Enterprises Oil, with $1.1 million?
24   A.  To do an oil operation, yes.
25   Q.  So they invested $1.1 million with you?

58

1  A. For an operation, and the objective was to
2  acquire an oil contract and a client for oil, and that
3  money was going to be used for the expenses of
4  obtaining those two things.
5  Q. Were you supposed to purchase a letter of
6  credit on behalf of JPL Capital Investment?
7  A. No. That's false. The letter of credit or
8  the letter of credits are not purchased.
9  Q. Okay. I'd like for you to take a look at
10 what was previously marked as Plaintiff's Exhibit 85.
11 And, once again, can you identify what that
12 document is? Can you identify what that document is?
13 A. I don't know.
14 Q. Take a look through that document.
15 A. I looked at it, but I remind you that I don't
16 speak or understand English.
17 Q. Okay. Turn to the second page of that
18 agreement, please.
19 Is that your initial on the bottom --
20 A. They appear to be.
21 Q. -- in the bottom of the second page?
22 Let me show you. Page 2 of 8 it says at the
23 bottom. Are those your initials?
24 A. I don't know if they are or not. They look
25 like them, but I don't know.

59

1  Q. Did you enter into a joint venture agreement
2  at any point in time with -- and by "you," I mean
3  Qubeoil -- did you enter into a joint venture
4  agreement with JPL Capital Investment?
5  A. Yes.
6  Q. Okay. And what was your understanding of the
7  purpose of that joint venture agreement?
8  A. I will explain it again. It was to acquire
9  an oil contract and a purchaser of oil.
10 Q. Did you negotiate that contract with JPL?
11 A. JPL doesn't sell oil.
12 Q. Did you negotiate a joint venture agreement
13 at any point in time with JPL Capital Investment?
14 A. Yes.
15 Q. Okay. And what was -- what was your role in
16 that agreement?
17 A. To look for the oil contract, to look for the
18 buyer for that oil, and to look for the financing for
19 the purchase of that oil.
20 Q. And what was JPL's role?
21 A. To invest the money to cover the expenses of
22 that process.
23 Q. Okay. And what were the expenses of that
24 process?
25 A. The cost of that process are high. You're

60

1  talking about a very complicated operation. Mostly
2  it's an operation that could give on a monthly basis
3  around $30 million. And I acquired the contract with
4  the supplier that was Vanilla. There is a POP that
5  was done -- done via swift.
6  MS. RODZ: I'm sorry to interrupt, but
7  Vanilla is the name of the company?
8  THE WITNESS: Vanilla, and Vanilla is a
9  fronting of Gazprom and Siberia Gas Bank that sent
10 that POP, proof of product, bank to bank, not that
11 I took it to Century Bank or from Siberia Gas Bank
12 to U.S. Century Bank, so the product had already
13 been acquired. The client was going to purchase
14 that product. It was AFI that had an agreement
15 with PREPA in Puerto Rico. All of that was
16 acquired by Qubeoil.
17 MS. RODZ: I'm sorry. "It was obtained by
18 Qubeoil."
19 THE INTERPRETER: Yeah, it wasn't acquired.
20 Okay. Obtained, yes.
21 THE WITNESS: It was obtained by Qubeoil.
22 Qubeoil obtained that filling the requirements of
23 that contract or joint venture, but since it's a
24 public domain, towards the end of October or
25 beginning of November, PREPA, their tanks burnt in

61

1  Puerto Rico, and our contract got delayed. The
2  Russians started to become nervous why it was
3  happening, and we have this -- the product is
4  already separated here and we cannot ship.
5  We spoke with them. More money was spent on
6  that. An extension with PREPA was made that AFI
7  got it with us. And when the moment of supplying
8  that in March came around, PREPA changed the rules
9  of the game.
10 Two basic things that the operation could not
11 be done. First, they would not pay us now in 30
12 days. That's why then Sergio Pino could not come
13 into the operation. They would pay us in 60 days,
14 and if it's paid in 60 days, when we're talking
15 about expenses in product of $30 million, you have
16 to have $90 million available and the operation was
17 not viable financially speaking.
18 And, second, PREPA did not have tanks in San
19 Juan, Puerto Rico. PREPA did not have tanks in San
20 Juan. They had burnt. And the port that was given
21 to us was a port that was down in Ponce. That
22 meant there was enough tanks for -- sufficient
23 tanks for a tank of -- for a ship of 60,000 tons to
24 come in.
25 The operation was also not viable because of



IN THE CIRCUIT COURT OF THE
ELEVENTH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO. 10-37899 CA 40

JPL CAPITAL INVESTMENT, LLC,
a Florida Limited Liability Company

        Plaintiff,

v.

QUALITY BUSINESS ENTERPRISES OIL
(QUBEOIL), LLC, a Florida Limited Liability
Company, FELIX MOSTELAC, an individual
residing in Florida, and U.S. CENTURY BANK,
a Florida Corporation,

        Defendants.

_____/

**AFFIDAVIT OF JPL CAPITAL INVESTMENT, LLC
IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO AMEND COMPLAINT TO
ADD PUNITIVE DAMAGES AGAINST FELIX MOSTELAC
& QUALITY BUSINESS ENTERPRISES OIL & IN SUPPORT OF PLAINTIFF'S
SECOND MOTION FOR CONTEMPT AND IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS FOR FRAUD ON THE COURT**

STATE OF FLORIDA      )
                      ) ss:
MIAMI-DADE COUNTY  )

      BEFORE ME, the undersigned authority, duly authorized to administer oaths and take

acknowledgments, appeared Luis Homes, who after being first duly sworn, on oath deposes and

says:

     1.    I am a managing member of the Plaintiff, JPL Capital Investment, LLC, in the

above-styled cause. I am also an attorney licensed to practice law in Venezuela, having

practiced in Caracas and Maracaibo Venezuela for over 25 years. I hold a Masters of Law

degree (LLM) and an International Tax Program (ITP) from Harvard University, Cambridge,

Massachusetts, and previously worked at one of the world's largest law firm Baker & McKenzie

CASE NO. 10-37899 CA 40

in Caracas, Venezuela. Actually, I have my own law firm in Maracaibo, Venezuela (Homes Urdareta & Asociados).

2.     I make this Affidavit based on my own personal knowledge.

3.     On or about early August 2009, MOSTELAC provided to JPL Capital Investment LLC, the attached audit letter and audited financial statements for Quality Business Enterprises Oil (Qubeoil), LLC ("QUBEOIL"). (*See* Exhibit A - Brito and Brito financial statements and audit letter, which are also attached to the Re-Notice of Taking Deposition of Luis Brito as Exhibit 74). These statements were personally hand delivered by Felix J. Mostelac ("MOSTEALC") to JPL Capital Investment, LLC.

4.     The financial statements referenced above and provided to JPL Capital Investment LLC by MOSTELAC were relied on by JPL in making a decision to invest an initial $800,000.00 with MOSTELAC and QUBEOIL, and were also relied on in investing an additional $300,000.00 and entering into the joint venture. These financial statements reported that QUBEOIL had multi-million dollars in revenue in 2009, a multi-million dollar net worth, and represented that they were audited financial statements.

5.     On or about September of 2009, JPL Capital Investment, LLC invested $800,000.00, with Felix J. Mostelac and his company, Quality Business Enterprises Oil (Qubeoil), LLC, with the understanding that the funds would be used solely to help secure the purchase of fuel for sale and distribution. MOSTELAC represented to me and to JPL Capital Investment LLC that the funds would be solely used to finance the oil transactions through letters of credit and that the funds would be applied to obtain letters of credit for the purchase of the fuel. No other use of the funds was authorized by JPL Capital Investment, LLC.

2



CASE NO. 10-37899 CA 40

6.     On or about late October of 2009, MOSTELAC represented to JPL Capital Investment, LLC that the deal to re-sell marine diesel fuel had not materialized because the quality of the diesel fuel was unsatisfactory.   Therefore, he suggested for JPL Capital Investment, LLC to invest an additional $300,000.00, so that JPL could participate in a more lucrative investment involving the re-selling of fuel to a Puerto Rican Electrical Power Authority (PREPA) that was in need of fuel based products.

7.     Accordingly, Mostelac represented that the $1,100,000.00 invested by JPL Capital Investment LLC would be applied solely to finance this transaction. After being shown by MOSTELC a letter on U.S. Century Bank letterhead dated October 27, 2009 regarding a transaction with PDVSA, and after being presented with several documents regarding the Puerto Rican oil transaction, in December of 2009, JPL Capital Investment, LLC invested with MOSTELAC and QUBEOIL an additional $300,000.00, for a total of $1,100,000.00.   JPL Capital Investment, LLC on January of 2010, signed the attached Joint Venture Agreement.  *(See* Exhibit B, Joint Venture Agreement dated January 18, 2010). This Joint Venture Agreement would be the operating agreement between JPL Capital Investment, LLC and Quality Business Enterprises Oil (Qubeoil), LLC, and documented the deal between QUBEOIL and JPL Capital Investment, LLC.

8.     MOSTELAC and QUBEOIL, however, failed to make any monthly returns of the JPL investment monies, which were due within thirty days from the initial investment. In fact, only after much insistence did MOSTELAC and QUBEOIL return $70,000.00.  MOSTELAC continuously represented that there were delays in the operations.

9.     To keep JPL Capital Investment, LLC from taking immediate legal action, on   or about March, 2010, MOSTELAC and QUBEOIL provided JPL Capital Investment LLC with a

3



CASE NO. 10-37899 CA 40

letter on U.S. Century Bank letterhead signed by a Senior Vice President of the Bank, Mr. Miguel Coira, addressed to JPL Capital Investment, LLC stating that MOSTELAC and QUBEOIL were under contract financing a multi-million dollar oil deal. (*See* Exhibit C – Letter with Miguel Coira's signature from U.S. Century Bank).[1]

10.    MOSTELAC and QUBEOIL presented JPL with the above letter and assured the JPL investors and managing members that payment would be forthcoming, and that they would be soon receiving a return of the capital and interest. It turns out that none of the monies were ever returned except $70,000.00.

11.    I have personally reviewed the bank records from U.S. Century Bank and Banco Popular, which were obtain by subpoenas issued by JPL Capital Investment, LLC's attorneys. It is clear to me that the $1,100,000.00 JPL Capital Investment, LLC invested with Felix Mostelac and QUBEOIL were wrongfully applied for personal use by MOSTELAC, including transfers to his girlfriend, Norvis Diaz Banos, and that none of the funds were used to finance the oil purchases.

FURTHER AFFIANT SAYETH NAUGHT.

Luis Homes, Managing Member of JPL
Capital Investment, LLC

The foregoing instrument was acknowledged before me, this 5 day of January, 2012, by Luis Homes, who is (X) personally known to me or who (—) has produced _____ (type of identification) as identification and who did (did not) take an oath.

Notary Public, State of Florida

Jeannette Lorenzo
COMMISSION #DD899619
EXPIRES: JUL 31, 2013
WWW.AARONNOTARY.com

---

[1] In his deposition, Mr. Coira denied ever signing or writing the letter marked as Exhibit C.

4

# BRITO AND BRITO ACCOUNTING, INC.

407 Lincoln Road, Suite 300
Miami Beach, Florida 33139
305-534-9292 Office
305-534-7534 Fax
www.britoandbrito@aol.com
August 8, 2007

Board of Directors
Quality Business Enterprise Oil ( Qube Oil ) LLC
Miami, Florida

We have audited the accompanying INTERIM balance sheet of Quality Business
Enterprises Oil ( Qube Oil ) LLC, as of July 31, 2006 and the related Statements
of Income and Retained Earnings, for the months then ended. Those financial
statements are the responsibility of the Company's management. Our
responsibility is to express an opinion on these financial statements based on our
audits.

We conducted our audits in accordance with generally accepted auditing
standards. Those standards require that we plan and perform the audit to obtain
reasonable assurance about whether the financial statements are free of material
misstatement. An audit includes examining, on a test basis, evidence supporting
the amounts and disclosures in the financial statements. An audit also includes
assessing the accounting principles used and significant estimates made by
management, as well as evaluating the overall financial statement presentation.
We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the interim financial statements referred to above present fairly, in
all material respects, the correct financial position of Quality Business Enterprises
Oil ( Qube Oil ) LLC, as of July 31, 2006, and the results of its operations and its
cash flows for the years then ended. In conformity with generally accepted
accounting principles.

Sincerely,

Luis G. Brito

Luis G. Brito
Accountant/CEO

EXHIBIT

A

## Independent Auditors' Report on Accompanying Information

Quality Business Enterprises Oil ( Qubo Oil ) LLC
Miami, Florida

Our audit was made for the purpose of forming an opinion on the basic financial statements taken as a whole. The accompanying information is presented for purposes of additional analysis and is not a required part of the basic financial statements. This information has been subjected to the auditing procedures applied in the audit of the basic financial statements and, in our opinion, is fairly stated in all material respects in relation to the basic financial statements taken as a whole.

August 5, 2009

Quality Business Enterprises Oil ( Qube Oil ) LLC.

Interim Statement of Income
Accrual basis
Year to date ending July 31, 2009 ( Seven months)

Income:

| | |
|---|---|
| Contract Revenue (Note 1) | $ 4,500,000 |
| Equipment Rentals | $    000,000 |
| | $ 4,500,000 |
| | |
| Contract Costs | $0,000,000 |
| Gross Profit | $ 4,500,000 |
| General and Administrative Expense (Schedule 1) | $   580,528 |
| Income Before Income Taxes | $ 3,919,472 |
| Income Taxes (Note 7) | $ 1,571,815 |
| Net Income after Income Tax | $ 2,547,657 |

See notes to financial statements.

Quality Business Enterprises Oil, ( Qube Oil ) LLC.

Interim Statement of Retained Earnings
(Accrual Basis)
Year to date ending July 31, 2009 ( Seven months )

| | |
|---|---|
| Balance beginning | $0,000.00 |
| Net income for the year | $2,547,657 |
| Distribution; Cash | $  000,000 |
| Balance ending | $2,547,657 |

See notes to financial statements.

See notes to financial statements.

Quality Business Enterprises Otl ( Qube Oil ) LLC

General and Administrative Expense

Year to date ending July 31, 2008 ( Seven months )

| | |
|---|---|
| Officer Salary | $ 000,000 |
| Office Salary ( Madrid ) | $ 141,750 |
| Insurance | $ 3,505 |
| Auto & Truck Exp. | $ 24,898 |
| Office Rent ( Madrid, Spain ) | $ 37,500 |
| Office Rent ( Miami ) | $ 110,000 |
| Telephone | $ 7,288 |
| Travel Exp | $ 210,343 |
| Utilities | $ 9,137 |
| Meals & Entertainment | $ 9,273 |
| Bank Charges | $ 577 |
| Miscellaneous | $ 29,289 |
| | |
| Total General and Administrative Expense | $ 865,528 |

Quality Business Ent... ...base Oil (Cube Oil) LLC
(Accrual Basis)

Interim Balance Sheet—July 21, 2009

| ASSETS | | | | LIABILITIES AND SHAREHOLDERS EQUITY | |
|---|---|---|---|---|---|
| **Current Assets:** | | | | **Current Liabilities:** | |
| Cash | | $ 30,000 | | Current Portion of Long Term Debt | $ 000,000 |
| Accounts Receivable | | | | Accounts Payable | $ 000,000 |
| Due on Contracts | | | | Billings in excess of costs and estimated | |
| Current | | 14,000,000 | | earnings on uncompleted contracts | $ 000,000 |
| Retired | | $ | | Payroll Taxes withheld and accrued | $ 000,000 |
| Equipment Rentals | | $ | | Accrued Expenses | $ 000,000 |
| Costs and estimated earnings in excess of | | | | Income taxes: | |
| billings on uncompleted contracts | | $ 1,000,000 | | Current | $ 000,000 |
| Prepaid Expenses | | $ | | Deferred | $1,371,516 |
| **Total Current Assets** | | **$4,590,000** | | **Total Current Liabilities** | **$ 1,371,516** |
| | | | | | |
| **Property and equipment:** | | | | Long term debt, net of current portion | |
| Machinery and equipment | $ 900,000 | | | (Shareholders Loans) | $ 940,625 |
| Transportation equipment | $ 900,000 | | | | |
| Office equipment | $ 900,000 | | | **Stockholder's equity:** | |
| Leasehold improvements | $ 900,000 | | | Common Stock, $1 par authorized 100,000 | |
| | $ 450,000 | | | shares, issued and outstanding shares | $ 50,000 |
| Less accumulated depreciation | $ 900,000 | | | Capital in excess of par | $ 600,000 |
| | | | | Retained earnings | $2,842,857 |
| | | **$4,590,000** | | | **$4,590,000** |

See notes to financial statements.

Quality Business Enterprises Oil ( Qube Oil ) LLC.

Notes to Financial Statements

Year to date ending July 31, 2009

1.  Long-term contracts signed with Chine Petroleum & Chemical Corporation ( See
    attached contracts and total term agreement signed by SINOPEC appointing QUBE
    Oil as their legal buyer )
    First contract is for 1,000,000 MT per month, 12 months with rolls and extensions
    Second contract is for 500,000 MT per month, 12 months with rolls and extensions
    Qube oils commission is $1.00 per MT

2.  Long-term debt: None

Commitments: None

Employee Benefit plans: only health insurance

Income Taxes:
    Current Federal & State      $1,571,815

## JOINT VENTURE AGREEMENT

THIS JOINT VENTURE AGREEMENT (hereinafter referred to as the "Agreement") is made and entered into this 11 day of January 2010, between and among JEL CAPITAL INVESTMENT, LLC (hereinafter referred to as the "Capital Contributor") whose address is 3785 NW 82 Avenue, Doral, Florida 33178 and QUALITY BUSINESS ENTERPRISES, INC. (QUBEQIL), LLC (hereinafter referred to as the "Management Company") whose address is 6435 Allison Road, Miami Beach, Florida 33141 (who shall all be referred to collectively hereinafter as the "Parties").

### WITNESSETH

WHEREAS, the Management Company possesses certain knowledge and contacts pertaining to the acquisition of fuel products, including, but not limited to, gasoline, jet fuel and diesel fuel, from refiners and the like and has experience in the acquisition and resale of such products; and

WHEREAS, the Management Company has entered into a partnership/joint venture agreement with Alternative Fuels Inc., a corporation organized and existing under the laws of the Commonwealth of Puerto Rico (hereinafter "AFI") in connection with the winning Bid Number QUB1319/Contract 902-07-09 for the provision of 4,200,000 barrels of No. 2 light distillate fuel oil to the Puerto Rico Power Authority (hereinafter "PREPA"). Copies of the Fuel Purchase Contract 902-07-09, the Memorandum of Understanding between AFI and QUBEQIL, and correspondence from Carlos Lopez Ramoto on behalf of AFI dated October 21, 2009 are attached as Schedules I to this Agreement;

WHEREAS, the Capital Contributor has the contacts and financial wherewithal to assist in the acquisition of fuel products and desires to engage and participate in the business of acquiring and reselling fuel products; and

WHEREAS, the Parties recognize the benefits of engaging in joint efforts in order to fully exploit the business of acquiring and reselling fuel products and seek therein to enter into a joint venture to acquire and resell fuel products and to conduct other related business activities associated with the acquisition and resale of fuel products, including, but not limited to, the involvement of the Capital Contributor in all facets of the acquisition and resale of No. 2 light distillate fuel to PREPA.

NOW, THEREFORE, in consideration of the payment of TEN DOLLARS ($10.00), along with the promises, covenants and mutual promises and undertakings herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

EXHIBIT

B

1. **OBJECTIVES OF THIS JOINT VENTURE:** The objective of this joint venture shall be to
   a. Collaborate efforts between the Management Company and the Capital Contributor in order for Management Company to fulfill its requirements in the Memorandum of Understanding attached to Schedule 1; and
   b. Acquire Four Million Two Hundred Thousand (4,200,000) barrels of No. 2 light distillate fuel (hereinafter, the "Product") or such other amount as required by PREPA during the term of Contract 902-07-03; and
   c. Acquire and resell such other fuel products as contemplated between the parties in the documents set forth in Schedule 1.

2. **TERM OF THE AGREEMENT:** This joint venture shall commence on the date first above written and shall continue in existence until terminated, liquidated, or dissolved by law or as hereinafter provided.

3. **DUTIES OF THE CAPITAL CONTRIBUTOR:** The Capital Contributor shall tender the sum of One Million One Hundred Thousand Dollars ($1,100,000.00) to the Management Company in order for the Management Company and AR to obtain a Letter of Credit from a financial institution as security for the purchase of the Product as contemplated by the Parties. The Parties specifically agree that the funds are solely to be utilized for the acquisition/purchase of the Product to be sold and delivered to PREPA and are not to be utilized for any other purpose whatsoever without a further written agreement between the Parties. The Parties further agree and acknowledge that based upon previous business associations the funds contemplated herein have been tendered in Management Company and the Letter of Credit obtained in connection therewith is attached to this Agreement as Schedule 2. The Capital Contributor shall also assist Management Company with locating vendors of the product and such other business functions as necessary.

4. **DUTIES OF THE MANAGEMENT COMPANY:** The Management Company shall engage in efforts to research and locate suitable vendors of the Product in order to maximize the profit for the venture. Further, as the Management Company has entered into the Memorandum of Understanding with AR, the Management Company agrees to pledge as collateral, to the Capital Contributor twenty-five percent (25%) of its outstanding membership units. Upon the satisfaction of the terms set forth herein and the dissolution of the Joint Venture, the collateral shall be released by the Capital Contributor to the Management Company.

5. **ALLOCATION OF REVENUES:** The Parties agree that revenues from the joint venture shall be allocated in the following manner:
   a. Capital Contributor shall receive a sum equal to $70,000.00 per month based upon the provision of 350,000 barrels of the Product to PREPA on a monthly basis during the term of the contract for totals of $840,000.00 and $200,000 barrels. Notwithstanding the payment procedures of PREPA or the exact

dates of the delivery of the Product to PREPA, the Parties agree that the initial payment (1 of 10) to the Capital Contributor shall be tendered by the Management Company on or before February 25, 2010. Payments thereafter shall be made on the 25th of each consecutive month or at such other time as determined between the parties in a further written agreement. The payment discussed herein is separate and independent from the return of the initial monies invested and discussed in Paragraph 5(b) below.

b. Upon the conclusion of the contract or the termination of this Agreement, Capital Contributor shall receive a return of the full amount set forth in Paragraph 5 above.

c. Capital Contributor shall also receive a percentage of any and all other final sales or part of the joint venture. Said distribution shall be in an amount equal to the Capital Contributor's proportionate distribution of the PREPA contract received in Paragraph 5(a) above.

d. Management Company shall retain the remainder of revenues received from the joint venture.

6.   **NON-CIRCUMVENTION.** The undersigned Parties, their officers, directors, members, managers, employees, agents, partners, assemblies, affiliates, parent companies, subsidiary companies, predecessors, successors, assigns, representatives, and heirs, intending to be legally bound, hereby irrevocably agree not to circumvent, avoid, bypass, or obviate each other, directly or indirectly, to avoid payment of fees, commissions, or any other form of compensation in any transaction for a period of two (2) years following the effective date of this Agreement or for a period of two (2) years following the last transaction or series of transactions between the Parties, whichever is longer. To this end, the Parties agree that during this time neither shall, either directly or indirectly:

a. Make contact or attempt to make contact, solicit or attempt to solicit, negotiate or attempt to negotiate, enter into or attempt to enter into any agreement, and/or transact or attempt to transact any business with any of the other parties' Contacts, or any person or party that is connected with any of the other parties' Contacts. For purposes of this Agreement, "Contact" is hereby defined to include both Buyer and Seller or any person, company, business, partnership, joint venture, association, entity, and/or organization, whether of foreign or domestic origin, that is introduced and/or identified by one party of this Agreement to the other party of this Agreement, provided of course there was no prior contact with any of the above described parties by the Buyer in some prior relationship, business dealing, introduction by any of Buyer's relationships and/or personal and company business network and data base; and/or

b. Commit any other acts, directly or indirectly, which would circumvent, compromise, undermine or affect in any way whatsoever, the other's relationship with said other's Contacts (as such term is defined in Subparagraph "a." above).

_____ CO Initials                                    MU Initials _____

7. **NON-DISCLOSURE.** No party shall disclose or otherwise reveal to any third party for any purpose whatsoever, any confidential information, which includes, but is not limited to, information regarding the acquisition of fuel products, processes, business plans, implementation strategies, and any other information or data, written, oral or otherwise, whether or not marked "Confidential", provided by any of the Parties without the specific written consent of the other party. The Parties further agree to maintain in confidence and not to duplicate, publish, distribute or use in any other manner whatsoever any information provided by any other party to this Agreement. This confidentiality obligation shall extend to the partners/owners, successors, agents, representatives, heirs, and assigns of any party to this Agreement. Further, in order to protect the confidential information, in the case of transmission to any authorized third parties, such transmission shall only be done under an agreement that the information remain confidential and that guarantees such information will not be disclosed.

8. **BOOKS AND RECORDS.** The Management Company shall keep adequate books and records at its place of business of all business transactions arising out of and in connection with the conduct of the joint venture.

9. **OWNERSHIP INTERESTS.** Subject to the allocation and distribution of revenue provisions set forth herein, all property shall be titled in the name of the Management Company or AFL.

10. **DEFAULT OR BREACH.** In the event of any breach of this Agreement, directly or indirectly, or the circumvention of any party to this agreement, in addition to any other legal remedies which may be available, the other parties may seek and obtain injunctive relief against such breach or threatened breach without proof of actual damages and without the posting of a bond or other security in accordance with the laws and rules of courts of any state. Further, the Parties mutually agree that it would be impractical or extremely difficult to fix, prior to signing this Agreement, the actual damages which would be suffered by either party, if one or more of the parties fails to adhere to its obligations under this Agreement. Therefore, the Parties mutually agree that if either Party breaches any of the terms of this Agreement, the prevailing party shall have the right to reimbursement of all legal fees plus damages in the amount of One Million Eight Hundred Sixty Thousand Dollars ($1,860,000.00).

11. **FURTHER INSTRUMENTS.** The Parties hereto covenant and agree that they will execute each such other and further instruments and documents as are or may become reasonably necessary or convenient to effectuate and carry out the purposes of this Agreement.

12. **DISSOLUTION OF THE JOINT VENTURE.** The joint venture shall be dissolved upon the happening of (i) the sale or other disposition of the assets of the joint venture and the distribution pursuant to such sale or (ii) the mutual

agreement of the Parties.

13. **INDEMNIFICATION OF THE JOINT VENTURERS:** The Parties shall have no liability to the other for any loss suffered which arises out of any action or inaction if, in good faith, it is determined that their course of conduct was in the best interest of the joint venture and such course of conduct did not constitute negligence or misconduct. The Parties shall each be indemnified by the other against losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by it in connection with the Joint Venture.

14. **NON-EXCLUSIVE NATURE:** The Parties agree that, subject to the confidentiality provisions contained herein, this Agreement shall not be exclusive.

15. **SECTION HEADINGS:** It is understood by all Parties that all section headings herein are for purposes of descriptive convenience only and are in no way meant to supersede, modify or otherwise change the underlying terms of this agreement; the Parties hereto agree that in case of any conflict between a paragraph and its (or any other's) section headings, the language in the paragraph shall be deemed to be controlling.

16. **SEVERABILITY:** If any provision of this Agreement or portion thereof is found to be invalid or unenforceable under applicable law, it shall be omitted from the Agreement without invalidation of the remainder of such provision or the remaining unoffending provisions of this Agreement.

17. **GOVERNING LAW:** This Agreement shall be subject to and governed by construction with the laws of the State of Florida, with Venue for any dispute properly being located in Miami-Dade County.

18. **ADVICE OF INDEPENDENT COUNSEL:** Each party has had the opportunity to obtain independent counsel with reference to negotiating the terms and conditions of this Agreement, as well as the legal effects of this Agreement, and as both parties have contributed in equal to any ambiguities in the drafting shall be drawn strictly construed against either party.

19. **ENTIRE AGREEMENT AND NO MODIFICATION:** This Agreement contains the entire agreement of the Parties. Further, no modification of the terms of this Agreement shall be valid unless in writing and signed by all parties.

20. **EXECUTION IN COUNTERPARTS:** This Agreement may be executed in two or more counterparts, each of which shall be treated an original, but all of which together shall constitute one and the same instrument. The delivery by facsimile of an executed counterpart of a signature page of the Agreement shall be effective as delivery of a manually executed counterpart of this Agreement.



# EXHIBIT 3

# Exhibit "A"

U.S. CENTURY BANK
00001

Redacted

| | |
|---|---|
| ACCOUNT NO. | 306. |
| STATEMENT PERIOD FROM: | 09/23/2009 |
| TO: | 09/30/2009 |

1
QUALITY BUSINESS ENTERPRISES OIL LLC
6493 ALISSON ROAD
MIAMI BEACH FL 33141

PAGE    1 of 2

**TYPE OF ACCOUNT... Business Analysis Account**

| Beginning Balance | We Have Added | | We Have Subtracted | | Ending Balance |
|---|---|---|---|---|---|
| | Number | Deposits/Credits | Number | Checks/Debits | |
| $ .00 | 1 | $ 400,000.00 | 0 | $ 0 | $ 400,000.00 |

| Items Enclosed | Minimum Balance | Average Balance | Average Available Balance |
|---|---|---|---|
| 1 | $ 0.00 | $ 400,000.00 | $ 337,500.00 |

——————————— DEPOSITS ———————————

| DATE | AMOUNT | DATE | AMOUNT | DATE | AMOUNT |
|---|---|---|---|---|---|
| 09/23/2009 | 400,000.00 | | | | |

U.S. CENTURY BANK
00002

# US Century Bank

Redacted

Account: 306!
Page: 2 of 2



09/23/2009      $400,000.00

Redacted

U.S. CENTURY BANK
00003

US Century Bank



Quality Business Enterprises Oil LLC

**U.S. CENTURY BANK**
Global Banking Division
3500 N.W. 27th Avenue
Doral, Florida 00138

Redacted

⑈0670153970 305⑈

09/23/2009        $400,000.00
34970000431211

---

0992

DATE 09/23/09

PAY Quality Business Enterprises Oil (QuEe Oil) LLC   $ 300,000ᵈᵒ

three hundred thousand  0/100 ———— DOLLARS

**Bank of America**

3ᵈ. Deposit (1ˢᵗ Quarter)

⑈000992⑈ ⑆063000047⑆ 878030?

09/23/2009   992   $300,000.00
34970000431212

Redacted

Redacted

U.S. CENTURY BANK
00004

US Century Bank



U.S. CENTURY BANK
00005

0001$
U.S. CENTURY BANK

US Century Bank



12/11/2009        $300,000.00
3497000059REDACTED



12/11/2009   7420147   $300,000.00
3497000059REDACTED

## Business Analysis Account

| | |
|---|---|
| U.S. CENTURY BANK<br>Doral Branch<br>2301 NW 87 Ave.<br>Miami, FL 33172 | **ACCOUNT NUMBER** 306. |

**ACCOUNT OWNER(S) NAME & ADDRESS**

QUALITY BUSINESS ENTERPRISES OIL
(QUBEOIL) LLC

6493 ALLISON ROAD

MIAMI BEACH FL 33141

**OWNERSHIP OF ACCOUNT - CONSUMER PURPOSE (Select one and initial)**

- [ ] _____ Single-Party Account   [ ] _____ Multiple-Party Account
- [ ] _____ Multiple-Party Account - Tenancy by the Entireties
- [ ] _____ Trust-Separate Agreement Dated: _____
- [ ] _____

**RIGHTS AT DEATH (Select one and initial)**

- [ ] _____ Single-Party Account
- [ ] _____ Single-Party Account With Pay-on-Death Designation (name beneficiaries below)
- [ ] _____ Multiple-Party Account With Right of Survivorship
- [ ] _____ Multiple-Party Account With Right of Survivorship and Pay-on-Death Designation (name beneficiaries below)
- [ ] _____ Multiple-Party Account Without Right of Survivorship

**NAME OR NAMES OF BENEFICIARIES:**

| TYPE OF ACCOUNT | [X] NEW    [ ] EXISTING |
|---|---|
| | [X] CHECKING   [ ] SAVINGS |
| | [ ] MONEY MARKET  [ ] CERTIFICATE OF DEPOSIT |
| | [ ] NOW |

This is your (check one):
[X] Permanent   [ ] Temporary   account agreement.

Number of signatures required for withdrawal ___2___
FACSIMILE SIGNATURE(S) ALLOWED?   [ ] YES   [X] NO

[_____ X _____]

SIGNATURE(S) - The undersigned agree to the terms stated on every page of this form and acknowledge receipt of a completed copy. The undersigned further authorize the financial institution to verify credit and employment history and/or have a credit reporting agency prepare a credit report on the undersigned, as individuals. The undersigned also acknowledge the receipt of a copy and agree to the terms of the following disclosure(s):

[X] Deposit Account  [X] Funds Availability  [X] Truth in Savings
[X] Electronic Fund Transfers  [X] Privacy  [X] Substitute Checks
[ ] _____

**OWNERSHIP OF ACCOUNT - BUSINESS PURPOSE**

- [ ] SOLE PROPRIETORSHIP   [ ] PARTNERSHIP
- [ ] CORPORATION:   [ ] FOR PROFIT   [ ] NOT FOR PROFIT
- [X] LIMITED LIABILITY COMPANY
- [ ] _____

BUSINESS:
COUNTY & STATE _____ FLORIDA
OF ORGANIZATION
AUTHORIZATION DATED: __03/31/2010__

DATE OPENED __09/23/2009__  BY __MARIA V. FUERTES__
INITIAL
DEPOSIT # _____   [ ] CASH  [ ] _____
HOME TELEPHONE # _____
BUSINESS PHONE # __786-370-__
E-MAIL __fmostelac@qubeoilusa.com__
EMPLOYER _____
Name and address of someone who will always know your location: _____

**BACKUP WITHHOLDING CERTIFICATIONS**

TIN: __26-3587604__

[X] TAXPAYER I.D. NUMBER - The Taxpayer Identification Number shown above (TIN) is my correct taxpayer identification number.

[X] BACKUP WITHHOLDING - I am not subject to backup withholding either because I have not been notified that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the Internal Revenue Service has notified me that I am no longer subject to backup withholding.

[ ] EXEMPT RECIPIENTS - I am an exempt recipient under the Internal Revenue Service Regulations.

SIGNATURE: I certify under penalties of perjury the statements checked in this section and that I am a U.S. person (including a U.S. resident alien).

X _____   __09/23/2009__
(Date)

ExFerrs® ©1992 Bankers Systems, Inc., St. Cloud, MN Form MPSC-LAZ-FL  4/18/2004

| (1): | [X _____] |
|---|---|
| | FELIX J MOSTELAC |
| | I.D. # __771-66-___   D.O.B. __11/19/:__ |
| (2): | [X _____] **Redacted** |
| | SERGIO PINO |
| | I.D. # __267-29-___   D.O.B. __09/09/:__ |
| (3): | [X _____] |
| | I.D. # _____   D.O.B. _____ |
| (4): | [X _____] |
| | I.D. # _____   D.O.B. _____ |

[ ] Convenience Account Agent (Single-Party Accounts Only)

[X _____]
I.D. # _____   D.O.B. _____

(page 1 of 2)

Page 2 of 3

9/01 $19,988.00
9/09 $  9,988.00

Todas por orden de Norvis Nedeff Diaz Banos, Suiza, necesitamos que por favor nos informe la relacion con su
cuenta y el motivo de las transferencias

Saludos,

*Neyda Rodriguez*
Vice President
Global Personal Banking
US CENTURY BANK
2301 N W 87th Avenue
Miami, Fl 33172
Telef. 305 715 5303
Cel.   305 781 6878
Fax   305 994 9357

The electronic mail message (including any attachments) contains privileged and/or confidential
information intended only for the use of the individual(s) or entity(ies) named above. If you are not
the intended recipient, you are hereby prohibited to disseminate, distribute or copy this electronic
message or the information contain herein. If you receive this electronic message in error, please notify
the sender immediately by telephone and return the original by mail.

From: Felix Mostelac [mailto:mostelac1@.               ]
Sent: Thursday, September 23, 2010 10:12 AM               **Redacted**
To: Neyda Rodriguez
Subject: Re:

Disculpe sra Rodriguez, si me puede enviar las comunicaciones en español pues no hablo inglés y no se
que me dice en su e mail.
Gracias
Felix Mostelac

Sent from my BlackBerry® on the MetroPCS Network

From: Neyda Rodriguez <Neyda.Rodriguez@uscentury.com>
Date: Thu, 23 Sep 2010 10:00:52 -0400
To: mostelac1@;              <mostelac1@;
Subject:

Incoming wires were received on 8/30, 9/1, and 9/9 from "Norvis Nedeff-Diaz Banos" in
Switzerland. Please indicate relation to our customer and purpose of wires.

*Neyda Rodriguez*
Vice President
Global Personal Banking

10/12/2010

U.S. CENTURY BANK
00092



**U.S. CENTURY BANK**

Miami, September 29, 2010

Felix Mostelac
Qube Oil
6493 Allison Road
Miami Beach, Fl 33141

**Redacted**

REF.:      ACCOUNT Nos. 306    ; 8|    und 191400

Dear sirs:

Pursuant to the terms and conditions set forth in our account disclosures, a copy of which were presented to and acknowledged by you or your authorized representative(s), we hereby give this written notice that we are exercising our right and our intention to close the above referenced account in 30 days' time.

We will continue to pay checks on this account until we have issued our cashier's check at the end of this period but we must advise you that we will not accept deposits to the account after October 15th, 2010.  We will close the account on October 29th, 2010 and the check will be mailed to the address of record, unless otherwise specified by you, in writing.

If you have any questions related to this action, please contact us by mail to the address below or by telephone at (305) 715-5303.

Very truly yours,

Neyda Rodriguez
Vice President
**USCENTURY BANK**

Global Personal Banking
2301 NW 87 Avenue, 3rd Floor
Miami FL 33172
(305) 715-5163/5164/5303/5311 Fax (305) 994-6357
patricia.gonzalez@uscentury.com; maria.fuertes@uscentury.com;
neyda.rodriguez@uscentury.com; rosa.ruiz@uscentury.com

U.S. CENTURY BANK
00094

Page 1 of 3

Charset [iso-8859-1 *          ]

En el archivo Iraemis escriblo que lo solicito y no lo recibio

---

**From:** Felix Mostelac [mailto:mostelac1@    **Redacted**
**Sent:** Wednesday, June 02, 2010 11:33 AM
**To:** Neyda Rodriguez
**Subject:** Re: FW: Flag - Quality Business Enterprise

Esa documentación del contrato entre petrofeno y qubeoil ya se lo envie en su momento pero si lo estravíaron se lo renvió como pasa con todos los documentos que les envío que tenemos que enviarcelos dos veces.
Agradeciendo su atención
FM

Sent from my BlackBerry® on the MetroPCS Network

**From:** Neyda Rodriguez <Neyda.Rodriguez@uscentury.com>

**Date:** Wed, 2 Jun 2010 11:16:51 -0400

**To:** mostelac1@gmail.com<mostelac1@    **Redacted**

**Subject:** RE: FW: Flag - Quality Business Enterprise

En Enero 27/10 Iraemis converso con ud en relacion a una transferencia a Petrofeno y ud contesto que era un suplidor

En Enero 28/10 ella le pregunto, ya que Petrofeno es una empresa que se dedica a productos del hogar y que necesitabamos mas información y ud le dijo que QUBEOIL tenia intereses comerciales/sociedad con Petrofeno. Por esto si esa transferencia era por algun prestamo, copia del documento si fue por alguna compra, cópia del documento de compra.

Saludos,

---

**From:** Felix Mostelac [mailto:mostelac1@    **Redacted**
**Sent:** Wednesday, June 02, 2010 11:02 AM
**To:** Neyda Rodriguez
**Subject:** Re: FW: Flag - Quality Business Enterprise

Hola defina documentacion que es lo que necesita para yo pedircela a ellos pues no es una empresa mia

https://172.19.132.114/cgi ...                    10/05/2010

U.S. CENTURY BANK
00096

Saludos
FM

Sent from my BlackBerry® on the MetroPCS Network

From: Neyda Rodriguez <Neyda.Rodriguez@uscentury.com>

Date: Wed, 2 Jun 2010 10:58:47 -0400

To: Felix Mostelac<mostelac1@x        **Redacted**

Subject: FW: Flag - Quality Business Enterprise

Buenos dias Sr. Mostelac:

Necesito que por favor me envie documentacion en relacion a Petrofeno ya que mi departamento de cumplimiento lo solicita

Saludos,

---

Neyda:

I want to close out this flag but I still have some pending doubts regarding the wire to Petrofeno. Please see Imants' comments 1/29/10 and 2/1/10. In your comments of 4/23/10 you wrote that the payment was for merchandise. Note also that on 2/3/10 we requested documentation for Petrofeno but this has not been attached.

Please call me so that we can discuss.

Thank you.

**Marla DeWitt, CAMS**

SVP – BSA / AML Officer

https://172.19.132.114/cgi-mod/openwebmail/openwebmail-read.pl?user=atorres&messa...   10/25/2010

U.S. CENTURY BANK
00097

Charset iso-8859-1 *

Lo siento pero no esta en el file, cuando lo envie sera archivado para no tener que pedirlo nuevamente.

Saludos,

Neyda

---

From: Felix Mostelac [mailto:mostelac1@          **Redacted**
Sent: Thursday, April 08, 2010 11:15 AM
To: Neyda Rodriguez
Subject: Re:

Ese contrato lo tiene Iraemis desde que me lo pidio hace mucho tiempo si lo desea de nuevo se lo renvio pero
porfavor archivelo ud bien pues no quiero renviar las cosas dos veces o cada ocasion que cambien a un
empleado.
Gracias
FM

Sent from my BlackBerry® on the MetroPCS Network

---

From: Neyda Rodriguez <Neyda.Rodriguez@uscentury.com>

Date: Thu, 8 Apr 2010 10:48:38 -0400

To: mostelac1@          <mostelac1@          **Redacted**

Cc: Maria Dewitt<MDeWitt@uscentury.com>

Subject:

Sr. Mostelac, Iraemis le habia solicitado la siguiente informacion:

Please provide comments regarding the deposit of a Bank of America cashier check issued by JPL
Capital Investment LLC and subsequent wire transfer to Petrofeno SL in Madrid, Spain.

Aun no se ha recibido la documentacion que le habia solicitado referente al cheque emitido por JPL
Capital y la transferencia a Petrofeno, por favor necesitamos esos documentos a la brevedad

https://172.19.132.114/cgi-mod/openwebmail/openwebmail-read.pl?user=atorres&messa...   10/25/2010

U.S. CENTURY BANK
00103


U.S. CENTURY BANK

June 1, 2010

To: Whom it may concern:

This is a letter of commitment for the purchase of Theodore Industrial Port, Mobile Alabama by the investor group lead by QUBEOIL USA. Felix Mostelac, president of QUBEOIL USA and Roger Charles compose the group that US Century Bank backs for the purchase of Theodore Industrial Port.

US Century Bank will fund the purchase of the port for $100 million dollars subject to certain conditions and stipulations in the contract.

Mr. Roger Charles and his partner will need to be provided with a complete inventory of the assets of the port both real and intangible (such as contracts and other operations to be continued at the port).

We will also need a list of the personnel (positions, salaries and benefits) who would like to stay on with the new owners. We look forward to the completion of this transaction.

Thanks in advance for your cooperation in this matter and call me if you have any questions.

Sincerely,

Miguel A. Coira
Senior Vice President
U.S. Century
305-710-5300

# EXHIBIT 4

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 10-37899 CA 40

JPL CAPITAL INVESTMENT, LLC,
a Florida Limited Liability Company,

        Plaintiff,

vs.

QUALITY BUSINESS ENTERPRISES OIL (QUBEOIL), LLC,
a Florida Limited Liability Company,
FELIX MOSTELAC, an individual residing in Florida,

        Defendants.

                                   X

Coral Gables, Florida
April 20th, 2011
10:00 A.M. - 1:15 P.M.

DEPOSITION

OF

SERGIO PINO

Taken Before Ronni M. Koebel
Notary Public in and for the State of Florida
at Large, pursuant to Notice of Taking Deposition

Page 62

1    Q.   Okay. Who is Maria Fuertes?
2    A.   I don't know.
3    Q.   Okay. Does she work at US Century Bank?
4    A.   I don't remember that name, no.
5    Q.   This document was produced to us by US
6    Century Bank. It's Bates stamp 00083. And the
7    document speaks for itself. But, as you can see, it
8    has your name, Sergio Pino. And please take a look
9    where it says your name.
10   A.   Yes.
11   Q.   It has an ID number that appears to be a
12   social security number; is that correct?
13   A.   Yes.
14   Q.   That number there?
15   A.   Yes.
16   Q.   That's your social security number?
17   A.   Yes.
18   Q.   And it says date of birth. Is that date of
19   birth correct?
20   A.   Yes.
21   Q.   Okay. Have you seen this type of document
22   before?
23   A.   Yes.
24   Q.   And what is your understanding of what this
25   document is?

Page 63

1    A.   It's to have your signature on an account.
2    Q.   Okay. And there's a date at the bottom left
3    of this document. Backup Withholding Certification,
4    September 23rd, 2009.
5         You see that?
6    A.   Yes.
7    Q.   Okay. Do you know if that's more or less the
8    time period in which Mostelac opened up the account at
9    US Century Bank?
10   A.   It seems that way.
11   Q.   Okay. And then it says authorization dated
12   on top. It says March 31, 2010. See that?
13   A.   Yes.
14   Q.   And you see in the prior e-mail,
15   again, the document speaks for itself, Plaintiff's 9,
16   it says, the e-mail date is March 30, 2010, in which
17   Mostelac is asking you to be added as a signatory to
18   the account.
19        You see that?
20   A.   Yes.
21   Q.   Does this refresh your recollection as to
22   whether Mostelac asked you to be added to the account
23   as a signatory?
24   A.   According to the e-mail and according to the
25   paperwork from US Century Bank, it's about the same

Page 64

1    time (indicating).
2    Q.   Okay. And looking at this document, do you
3    have any objection to being a signatory on the account?
4    A.   I don't remember how it happened, I don't
5    remember if I became a signatory or not. I don't
6    remember that if it had to do with because we were
7    going to put money in an account together, and I want
8    to have control over the funds that I was going to
9    invest. I just don't remember why.
10   Q.   Okay.
11   A.   And I don't remember if I ever became a
12   signature or not. If you show me I did, I did.
13   Q.   Okay. Well, the document do can't have your
14   signature.
15   A.   So I never did.
16        Chances are that I didn't want it to be,
17   or -- I don't even know that I got that e-mail, even
18   though it says my name in there.
19        You know, either I did or I didn't. Perhaps
20   he offered it to me, and I -- I had no reason to be a
21   part of that company --
22   Q.   Okay.
23   A.   -- or a signature. I just don't remember.
24   Q.   Okay. I'm going to make a reference to
25   Coira's deposition. I'll read it into the record. And

Page 65

1    just let me know if this refreshes your recollection on
2    anything.
3    A.   Okay.
4    Q.   Do you remember -- The question on page 55,
5    line seven:
6        "Do you remember Mr. Mostelac requesting
7    Mr. Pino to be a signatory to the account?
8    "Answer: I read one of the e-mails
9    yesterday that requested that.
10   "Do you know why he requested that?
11   "Answer: No, it wasn't me, so I don't
12   know."
13        Lines 16 through 18, question: "Of
14   course -- would that e-mail have been
15   enough --"
16        And I'm referring to that e-mail there that
17   was marked as Plaintiff's 9.
18   A.   Yes.
19   Q.   "Would that e-mail have been enough to add
20   Mr. Pino as a signatory to the QUBEOIL
21   account?
22   "Answer: Yes."
23        Do you have any reason to dispute that?
24   MR. PEREZ:  Object to the form of the
25   question. The witness has already testified

17 (Pages 62 to 65)



# EXHIBIT 5

Page 1

IN THE CIRCUIT COURT OF THE ELEVENTH
JUDICIAL CIRCUIT    ,    IN AND FOR
DADE COUNTY,    FLORIDA

· GENERAL JURISDICTION DIVISION

CASE NO. 10-37899 CA 46

JPL CAPITAL INVESTMENT, LLC,
a Florida Limited Liability Company,

       Plaintiff,

  vs.

QUALITY BUSINESS ENTERPRISES OIL (QUBEOIL),
LLC, a Florida Limited Liability Company,
FELIX MOSTELAC, an individual residing
in Florida,

       Defendants.

- - - - - - - - - - - - - - - - X

                255 Aragon Avenue, 2nd Floor,
                Coral Gables Florida
                Friday, March 25, 2011
                10:35 a.m. - 3:25 p.m.

          DEPOSITION OF MIGUEL COIRA
       Taken before Teresa H. Miranda
     Notary Public in and for the State
  of Florida at Large pursuant to notice.

**Page 114**

```
 1      Q.   Approximately?
 2      A.   A year.
 3      Q.   Do you know if the account had a balance
 4   when it was closed?
 5      A.   Yes, very small.
 6      Q.   Was the account balance the reason the
 7   account was closed?
 8      A.   The account balance?
 9      Q.   Was it because it had a low balance
10   that the Qube Oil account was closed?  Was that the
11   decision?
12      A.   Among other reasons, in the sense to have
13   an account with low balance that you are not going to
14   do anything in the future with.
15      Q.   How do you know that there was not going
16   to be anything done with the account in the future?
17      A.   Since none of the transactions that we
18   tried with Mr. Pino were completed, you know, it was
19   indicated to us that apparently there was not going
20   to continue -- that there were not going to be more
21   transactions.
22      Q.   Who asked that the account be closed?
23      A.   Who asked?  Individually, no, nobody
24   asked.
25      Q.   Did Mr. Pino ever ask that the account be
```

**Page 115**

```
 1   closed?
 2      A.   No.
 3      Q.   When you're saying that Mr. Pino did not
 4   complete a transaction with Qube Oil what are you
 5   basing that on?
 6      A.   On the Letters of Credit that we issued.
 7      Q.   What happened with those transactions?
 8      A.   They were cancelled.  They were nulled.
 9      Q.   Why were they nulled?
10      A.   Because we had a clause that if within
11   seven days the transactions were not completed the
12   Letter of Credit would be cancelled.
13      Q.   Do you know if they were cancelled
14   because the third-party that was involved in the
15   transaction requested that they be cancelled?
16      A.   No.
17      Q.   Why were they cancelled then?
18      A.   No.  The Letter of Credit automatically
19   after --
20      Q.   Expires?
21      A.   After that expires.  That's it.
22      Q.   Do you know, or do you have any knowledge
23   whether Qube Oil and Felix Mostelac misappropriated
24   funds for joint ventures in the oil industry --
25      A.   No.
```

**Page 116**

```
 1      Q.   -- to third parties?  Were you ever
 2   informed of that by somebody?
 3      A.   No.
 4      Q.   Didn't you say earlier that somebody from
 5   JPL contacted you and told you that they had lost
 6   money with Qube Oil?
 7      A.   That they had financial monetary
 8   problems, yes.
 9      Q.   What else did they tell you?
10      A.   In regards to?
11      Q.   In regards to Qube Oil.
12      A.   That was about it.
13      Q.   Did they tell you that -- do you remember
14   how much money they told you they lost?
15      A.   He mentioned an amount, but I don't
16   recall.
17      Q.   Was it over a million?
18      A.   No.  I don't recall the amount.
19           (Thereupon a document was marked
20   Plaintiff's Exhibit No. 13 for Identification
21   to the deposition.)
22           THE COURT REPORTER:  13.
23   BY MR. PUENTE:
24      Q.   Please take a moment to review that and
25   take your time.
```

**Page 117**

```
 1      A.   (Witness complies.)  Uh-huh (affirmative
 2   expression).
 3      Q.   I'm showing you a letter that was
 4   produced by U.S. Century Bank in response to the
 5   subpoena, 00109 bates stamp.
 6           Is that your signature?
 7      A.   Yes.
 8      Q.   Did you prepare this letter?
 9      A.   No.
10      Q.   Do you know who prepared this letter?
11      A.   No.
12      Q.   Have you seen this letter before?
13      A.   Yes.
14      Q.   When did you see this letter?
15      A.   This company faxed me, Theodore
16   Industrial in Mobile, Alabama -- The person contacted
17   me by phone, and asked if we wrote that letter, and
18   my response was:  No, we didn't.  And I asked if he
19   had any originals with him.  He said:  No.  He had a
20   copy, and he said that he had never seen a letter
21   from a bank before, that he was suspicious about it,
22   and that's what why he contacted me about it.  And
23   that was the end of the conversation.
24      Q.   What did you do after you received that
25   phone call?
```

Page 126

1  got to put this before the Judge I will. This is
2  important.
3      MR. CAMPOS: I'm not telling him not to
4  answer. This is his --
5      MR. PUENTE: Okay.
6      MR. CAMPOS: This is his opinion and not
7  necessarily a question of what he knows or doesn't
8  know.
9      MR. PUENTE: That's objection to the
10  form. Go ahead.
11  BY MR. PUENTE:
12      Q. You've got to answer.
13      A. Well, obviously my suspicion is it came
14  from Qube Oil.
15      Q. Was that the belief that you had at the time
16  you received the letter?
17      A. Yes.
18      Q. And was it your belief that Qube Oil or
19  Mostelac forged your signature?
20      A. Qube Oil.
21      Q. Qube Oil?
22      A. Yes.
23      Q. Someone in Qube Oil?
24      A. Yes.
25      Q. Do you know who the principal of Qube Oil

Page 127

1  is?
2      A. No.
3      Q. You don't?
4      A. (Witness shrugs shoulders).
5      Q. Do you know what Mr. Mostelac's
6  connection is to Qube Oil?
7      A. He obviously represented the company in
8  the meetings that we participated in, but as to his
9  position within the group, or power or ranking, I
10  wouldn't know.
11      Q. Did you ever check the Florida Department
12  of State as to who the officers were of Qube Oil?
13      A. Yes, the Compliance Department has to do
14  the review.
15      Q. Did you ever do that?
16      A. No, not me.
17      Q. Are you aware that in 2010 the only
18  officer identified was Mr. Mostelac?
19      A. (Witness shakes head negatively.)
20      Q. You don't know?
21      A. No.
22      Q. Okay. Did you communicate your suspicion
23  to Mr. Pino that you believed your signature had been
24  forged by Qube Oil and Mostelac?
25      A. No.

Page 128

1      Q. Did you communicate your suspicion that
2  Qube Oil and Mostelac had forged to anyone?
3      A. No.
4      Q. So if I get a document from the bank,
5  eventually it's not going to indicate that you
6  suspected Qube Oil or Mostelac forged your signature?
7      A. Qube Oil?
8      Q. Qube Oil.
9      A. Yes.
10      Q. So your suspicion that Qube Oil forged
11  your signature, that's not in a document somewhere?
12      A. No.
13      Q. No, you don't know?
14      A. No, no. It's not I don't know. There is
15  no document regarding that.
16      Q. And what has Mr. Sergio Pino told you
17  about this letter?
18      A. Nothing.
19      Q. Did Mr. Pino ever tell you that he
20  believed Qube Oil was doing anything illegal or
21  improper?
22      A. No.
23      Q. Did Mr. Pino ever lead you to understand
24  that he stopped doing business with Qube Oil?
25      A. He mentioned a couple of times if we

Page 129

1  don't do one within the next couple of days I'm going
2  to stop doing it, but nothing concrete.
3      Q. Okay. Do you know if the bank ever
4  determined who wrote that letter?
5      A. No.
6      (Thereupon a document was marked
7  Plaintiff's Exhibit No. 14 for Identification
8  to the deposition.)
9      THE COURT REPORTER: 14.
10  BY MR. PUENTE:
11      Q. Please take your time and review this
12  letter.
13      A. (Witness complies.) Uh-huh (affirmative
14  expression).
15      Q. Have you reviewed it?
16      A. Yes.
17      Q. Did you write this letter?
18      A. No.
19      Q. Have you ever seen this letter before?
20      A. No, just now.
21      Q. First time you've seen this letter?
22      A. Yes.
23      Q. Is that your signature?
24      A. Yes.
25      Q. And that's U.S. Century Bank letterhead,

33 (Pages 126 to 129)

---

**Page 130**

1  or the symbol?
2      A. The symbol.
3      Q. Is that your e-mail Miguel.coira
4  @uscenturybank.com?
5      A. Yes -- no, actually U.S. Century.com.
6      Q. So the e-mail address is incorrect in
7  this letter?
8      A. Yes.
9      Q. Has it ever been U.S. Century Bank.com?
10     A. No.
11     Q. Is there such a thank as U.S. Century
12 Bank.com?
13     A. No.
14     Q. Is that your fax number (305) 994-9390?
15     A. To be honest with you, I don't know.
16 I don't know.
17     Q. You can take a moment to look if you have
18 a card.
19     A. Yeah. 994-9390, yes.
20     Q. Can I see your business card?
21     A. Sure.
22     Q. Do you know how your signature got on the
23 letter that you say you didn't write?
24     A. First time I see it. No.
25     Q. Well, I'm going to mark your card as

---

**Page 131**

1  Plaintiff's Exhibit 15 so that way I can identify
2  with the information in this letter rather than ask
3  you questions.
4      A. Okay.
5      Q. It says here in the last paragraph:
6  "This communication is to serve as a credit
7  reference and conveys no undertaking or engagement
8  responsibility for U.S. Century Bank, and does not
9  assume liability arising from any business
10 transaction."
11     Do you know who wrote that?
12     A. No.
13     Q. Do you know who wrote any part of this
14 letter here?
15     A. No.
16     Q. Do you know who Varnana Holing AG is?
17     A. No.
18     Q. Have you ever heard of that entity?
19     A. No.
20     Q. And it's directed to JPL Capital
21 Investment, LLC, is that correct?
22     A. That's what it says in the letter, yes.
23     Q. Do you know who wrote this letter?
24     A. No.
25     Q. Do you have any suspicion who wrote this

---

**Page 132**

1  letter?
2      A. First time I see it. No.
3      Q. Did you ever give Mr. Mostelac access to
4  your office or Qube Oil?
5      A. No.
6      Q. Do you know if Sergio Pino ever gave
7  access to Mostelac to use his offices at the building
8  to go meet clients?
9      A. I don't know.
10     Q. Do you know if Mr. Pino ever lent the
11 conference room where he has his present office for
12 Mr. Mostelac to meet clients and perspective joint
13 venture parties?
14     A. I participated in several meetings in his
15 office, yeah.
16     Q. With Mostelac?
17     A. With Mostelac, yes.
18     Q. Who else?
19     A. Prospective parties.
20     Q. How many times did this happen?
21     A. Several times.
22     Q. And were you acting on behalf of U.S.
23 Century Bank at the time that you had those meetings?
24     A. On behalf of -- yes, U.S. Century Bank
25 and Sergio Pino.

---

**Page 133**

1      Q. And Sergio Pino. And what was your role
2  in those meetings?
3      A. Just, you know, representing Mr. Pino's
4  interests. And besides that I didn't participate in
5  it actively.
6      Q. How many times did this happen?
7      A. Several times.
8      Q. And by "several" more than five?
9      A. No.
10     Q. Do you know who participated in those
11 meetings?
12     A. No, I don't.
13     Q. Besides Mr. Pino and Qube Oil?
14     A. I do not recall.
15     Q. Did you ever open up any accounts as a
16 result of those meetings?
17     A. No.
18     Q. Did any of those meetings result, to your
19 knowledge, into a business referral to the bank?
20     A. No.
21     Q. Did you keep notes, documents, anything,
22 any writings at all concerning those meetings?
23     A. No.
24     Q. Did those meetings take place after Qube
25 Oil opened up an account at the bank?

---


**U.S. CENTURY BANK**

June 1, 2010

To Whom it may concern:

This is a letter of commitment for the purchase of Theodore Industrial Port, Mobile Alabama by the investor group lead by QUBEOIL USA. Felix Mostelac, president of QUBEOIL USA and Roger Charles compose the group that US Century Bank backs for the purchase of Theodore Industrial Port.

US Century Bank will fund the purchase of the port for $100 million dollars subject to certain conditions and stipulations in the contract.

Mr. Roger Charles and his partner will need to be provided with a complete inventory of the assets of the port both real and intangible (such as contracts and other operations to be continued at the port).

We will also need a list of the personnel (positions, salaries and benefits) who would like to stay on with the new owners. We look forward to the completion of this transaction.

Thanks in advance for your cooperation in this matter and call me if you have any questions.

Sincerely,

Miguel A. Coira
Senior Vice President
U.S. Century
305-710-5300

Δ π EXHIBIT 13
Deponent COIRA
Date 3/29/11    Rptr VHH

U.S. CENTURY BANK
00109



**U.S. CENTURY BANK**

REDACTED

To: JH CAPITAL INVESTMENT LLC

By the present letter I would like to inform that Mr. Felix Mastelao with his company Quality Business Enterprises Oil (QUBEOIL), is under contract for the acquisition of 100,000 Metric Tones of Diesel under the contract ref# VHAG-QBLLC/0913-2MD/ASP/10 with Ventana Holding AG, and has the financial capacity to complete the contract obligation.

The transaction that has been reached to us because we will be issuing the payment instrument for this, which expected date of March 2011. The QUBEOIL account has been set up to this account to be receiving the funds for the sale of the goods on relative contracts.

The average amount which will be issue as payment instrument could be rounding the USD 62,000,000.00 monthly for the above transaction and expecting to receive around $65,000,000.00 monthly (these two amounts can be vary by the market price for the goods) on QUBEOIL account.

This communication is to serve as a credit reference and agrees to undertaking or engagement responsibility for US Century Bank and not assumes liability arising from any business transaction for above mentioned company.

Buyer's Bank Information:

Bank Name: US Century Bank
Address: 2301 NW 87TH AVENUE DORAL, FL 33172.
Account Name: QUALITY BUSINESS ENTERPRISES OIL (QUBEOIL), LLC
IBAN:
SWIFT: USCBUS3MXXX
USD Account No: 0017606497 9006440
Bank Officer Name: MIGUEL CORIA
Bank Officer Phone: 305 715 5802
Bank Officer Fax: 305 994 9890
Bank Officer Email: miguel.coria@uscenturybank.com

Sincerely,

Miguel A. Coria
Senior Vice President
U.S. Century Bank
305 715 5802

Δ π EXHIBIT 11
Deponent CORA
Date 3/25/11 Rptr TMH
www.depobook.com

# EXHIBIT 6

Redacted



| | |
|---|---|
| Posting Bank | 00000 |
| RTABA (Transit Number) | 11400001 |
| Account Number | 164100? |
| Check Number | 7286042 |
| Amount | $400,000.00 |
| Posting Date | 2009 Sep 21 |
| Control Number | 65181262 |
| Tran Code | 0 |
| Document Type | 10 |
| D/C | D |

Banco Popular 000287

21. **RECITALS TRUE AND CORRECT:** By affixing their signatures below, the Parties hereto agree that the above listed recitals are true and correct and form an integral and necessary part of this Agreement.

22. **RECOVERY OF LEGAL FEES & LITIGATION COSTS:** In the event, and to the extent that it becomes necessary for any party in any legal proceeding to enforce the terms of this Agreement, that party shall be entitled to recover all of his reasonable attorney's fees and related costs of whatever nature reasonably and necessarily incurred in the prosecution and/or defense of such legal action from the at-fault or defaulting or breaching party or parties, who shall remain jointly and severally liable therefore.

23. **NOTICES:** Except as may be otherwise provided in this Agreement, all notices required or permitted hereunder shall be in writing and shall be deemed to be delivered when deposited in the United States mail, postage prepaid, certified or registered mail, return receipt requested, and addressed to the other party at the address set forth above or at such other address as may be subsequently specified by written notice.

24. **ASSIGNMENT:** The Parties hereby agree that this Agreement may not be assigned without the express written consent of the other parties.

25. **WAIVER:** The failure of either Party to enforce any provision of this Agreement shall not be construed as a waiver or limitation of that Party's right to subsequently enforce and compel strict compliance with every provision of this Agreement.

26. **PARTIES BOUND:** This Agreement shall be binding upon all undersigned Parties along with their officers, directors, members, managers, shareholders, principals, independent contractors, employees, agents, partners, associates, affiliates, parent companies, subsidiary companies, predecessors, successors, assigns, representatives, and heirs.

JOINT VENTURE AGREEMENT
Page 7 of 8

SL DC Initials                                        NE Initials [signature]

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed on this ___ day of _____, 20__.

WITNESS _____
        (Print Name)

WITNESS _____
        (Print Name)

CAPITAL CONTRIBUTOR

_____

Juan Lopez

STATE OF FLORIDA)

COUNTY OF MIAMI-DADE)

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State of Florida and in the County of Miami-Dade to take acknowledgments, personally appeared Juan Lopez, who is Manager of FL Capital Investments, LLC, to me known to be the person described in and who executed the foregoing instrument and who acknowledged before me that he executed the same.

WITNESS my hand and seal in the County and State last aforesaid this _____ day of _____, 20__.

_____
NOTARY PUBLIC, STATE OF FLORIDA

My commission expires: _____
Personally known ___ or produced identification ___
Type of Identification Produced _____

MANAGEMENT COMPANY

WITNESS
_____
(Print Name)

By: _____
Its: _____

WITNESS
_____
(Print Name)

STATE OF FLORIDA:

COUNTY OF MIAMI-DADE:

I HEREBY CERTIFY that on this day, before me, an officer duly authorized in the State of Florida and in the County of Miami-Dade to take acknowledgments, personally appeared Felix Moynier, who is Manager of Quality Business Enterprises OR (QUBEEX), LLC, to me known to be the person described in and who executed the foregoing instrument and who acknowledged before me that he executed same.

WITNESS my hand and seal in the County and State last aforesaid this _____ day of _____, 2019.

_____
NOTARY PUBLIC STATE OF FLORIDA

My commission expires:
Personally known _____, or produced identification _____
Type of identification produced _____

CC Initials _____                                    MC Initials _____



**U.S. CENTURY BANK**

REDACTED

To: [illegible] INVESTMENT LLC

By the present letter I would like to inform that Mr. Felix [illegible] with his company Quality Business Enterprises Of [illegible], is under contract for the acquisition of 100,000 Metric Tons of Diesel under the contract ref [illegible] [illegible] with Verhina Holding AG, and has the financial capacity to complete the current obliga- tion.

[illegible paragraph]

The average amount which will be issue as payment instrument could be rounding the USD 62,000,000.00 monthly for the above transaction and expecting to receive around $65,000,000.00 monthly (these two amounts will be vary by the market price for the goods on current month).

[illegible paragraph] US Century Bank and will assume liability arising from any business transaction for above mentioned company.

Buyer's Bank Information:

Bank Name: US Century Bank
Address: [illegible] NW 37TH AVENUE  DORAL, FL 33172
Account Name: QUALITY BUSINESS ENTERPRISES OF [illegible] LLC
[illegible]
[illegible]
[illegible]
Bank Officer Name: MIGUEL CORIA
Bank Officer Phone: 305 715 5202
[illegible]
[illegible]

$100,000.00



Miguel F. Coria
Senior Vice President
U.S. Century Bank
305 715 5202



A # EXHIBIT [illegible]
Deponent [illegible]
[illegible]



EXHIBIT

C